Second case for argument please. Case number 24-1114 from the District of Nebraska. Adam Kemp v. Jane and John Doe et al. May it please the court, counsel. Robert Feuthy from the Fraser Stryker Law Firm in Omaha on behalf of the appellant Adam Kemp. Thank you for having your argument today. This is a case that was shot in the eye and is now blind in his right eye after the incident that occurred on May 29, 2020 during the protests that occurred in Omaha. So at a very high level before I go into the details, there are two issues that the district court passed on that should not have, that resulted in the dismissal. At the end of the day there were questions of fact as to number one, what Adam was doing and that's going to touch upon the First Amendment claim. And then number two, what Deputy Palmer believed he was doing and what Adam was doing in connection with the Fourth Amendment claim. I'm going to start with the Fourth Amendment claim because I think it's actually the easier claim here. And in connection with that, the district court essentially said no reasonable jury could ever find that Deputy Palmer was engaged in conduct other than dispersing a crowd. And so when I was going back and looking at the district court's order on pages 35 to 37, the district court laid out, I believe it's like 18 bullet points of facts that were taken from the defendant's summary judgment statement of facts. Going through those, and apologies, you have to kind of understand the geography of Omaha a little bit here for where these protests occurred. The first 15 facts in that recitation have to do with protests that were occurring at the intersection of 72nd and Dodge, which is the busiest intersection in the state of Nebraska. And that's where the epicenter of the protests were located. Now where Adam was shot was about a quarter mile to a third of a mile to the north of that, to the northeast of what used to be Crossroads Mall, at the intersection of 72nd and Cass. In addition, the main protest down at Dodge Road occurred earlier in the night, and by the time Adam was shot, I believe it was around 1130 at night, I'm kind of going off memory there, but it was later in the night as well. So to determine that no reasonable jury could find that Deputy Palmer was engaged in any conduct other than dispersing the crowd, the district court relied on events that occurred earlier in the night, well away, well far away from where Adam was shot. And then in the last three bullet points the district court recites, two of those were disputed in our statement of, in our response to the statement of facts by the district court, and we laid those out, and that's on pages 956 and 957 of the appendix. Well, isn't it at least sort of relevant what happened earlier in the sense that he was engaged, he being the deputy, was engaged in the same activity, didn't make any arrests, so doesn't that at least lead some credence to the idea that he was there to disperse crowds? Well, I think there's absolutely a fact question as to whether he was there to disperse or not, but we put a lot of evidence into the record as to showing that Deputy Palmer was engaged in the apprehension of Adam. So for instance, there's no dispute that Adam was hit on the shoulder and in the eye, and we put evidence in the record from Adam's ophthalmologist stating that he was hit with a blunt trauma to the eye, suggesting a direct hit, and under the Morvey Indahar case, which is a 2008 case from this court, it was recognized that when an officer who's trained to use a weapon fires and hits somebody, there's at least a question of fact as to whether they intended to apprehend that person. Now, in addition to that, we have testimony from Deputy Palmer on page 479 and 494 of the appendix that he was using his weapon as an impact weapon. Now, at other points too, Deputy Palmer said, oh yeah, I was just shooting at the gun too, but that's a fact question. We also have testimony from Deputy Palmer on pages 43 and 44 of actually the appellee's brief where Deputy Palmer stated he believed Adam was an agitator, a protester. And Deputy Palmer also stated in his deposition, this is on pages 872 to 874, that he was trained to subdue agitators with a pepper gun. There was a dispute as to the number of pepper balls that were fired. We have video, it does not exactly show the incidents, but you can hear the pepper balls being fired, and you can see the area where Deputy Palmer, or pardon me, the Walgreens parking lot, which was near where Adam got shot as well. And then finally, in support of the fact that there was at least a fact question that Adam was being apprehended, after the shooting, the officers came up, grabbed him, took him behind the police line, and Adam did not feel free to go. He felt that he was under a control measure at that time, and the folks that he was with were not allowed to come with him. So, I'm not saying that it's a slam dunk one way or the other. I'm just saying we need to have a jury sort this thing out, and the district court didn't let us do that by saying no reasonable jury could ever find that Deputy Palmer was engaged in an apprehension, or that he was only engaged in a dispersal. The Dundon case, I think, is clearly different on its facts. As I read Dundon, I believe Judge Benton, maybe you were on that panel as well, that involved a kind of a, I'll call it a siege type situation, where you had law enforcement on one side of a bridge, the protesters on the other. They're throwing rocks at each other. At some point, the protesters brought a dump truck up for some reason. There were several dump trucks there. Yeah. Yes. Brought one to the front. Go ahead. Yeah. So, just a completely different situation than what we were dealing with here with regard to Adam. So, with regard to the Fourth Amendment claim, we asked that the court find there was a question of fact as to whether Deputy Palmer intended to apprehend Adam, and then there was a question of fact as to whether there was a seizure through shooting Adam in the eye and then taking him behind the police line. Now, with regard to the First Amendment claim, I actually think this is the more interesting legal issue. And Judge Benton, I'm going to say the thing that we've all been waiting for me to say, which is, you were right in Molina. But I don't think I can just say that, because even if the majority's decision in Molina is the correct statement of the law, there's still at least a question of fact as to what Adam was doing and whether he was engaged in First Amendment activity. So, number one, Molina said in 2015, there was not a clearly established right to observe and record police activity. This incident happened May 29th, 2020. In the intervening time, there were three additional circuit courts that had passed on the issue. And I have down that the 9th, 11th, 1st, 7th, 3rd, 5th, and 10th circuits by at least 2019 had said that there was a clearly established right to observe and record. How many circuits does it take to clearly establish law when we don't have a case on the point? And we have an older case that says it was not. I mean, how do you wrestle with that? Is one enough? It's a robust consensus. Is the 7th enough, but not the 4th? You know, are there any cases going the other way? Not that I've seen other than Molina saying in 2015, it was not clearly established at that time. So, I think that by 2020, when this incident happened, May 29th, 2020, it was clearly established. And I'll refer the court to the Irizarry v. Yahia case, which is a 10th circuit case, 38 Fedforth, 1282, which kind of goes through the state of the law, at least as of 2019, before Adam's injuries occurred. Now, assuming that the, assuming there is a clearly established right to observe and record, Adam, at least there's a question of fact that Adam was doing that. Is there a distinction between observe and record that, I mean, was observing alone clearly established? Well, as I read Judge Benton's dissent in Molina, he would say yes, but the other two judges on the panel, and I'm blanking on them right now, said that was not enough. No First Amendment activity. First Amendment activity. Was their real point. And there are two 8th circuit cases, one's Chestnut, and I'm blanking on the other one as I sit here. Walker, and they're both, of course, distinguished in Molina. Yes. Yeah. But here, and Judge Benton may well be right in the big picture, but there's two against one there.  What about the idea here that he was at most assisting someone who was recording the... And I don't think that's a bright line that you need to draw or want to draw, because if the only people... But my question is, what makes that clearly established? If observing alone is not clearly established, what makes assisting somebody who is recording clearly established? Well, I think by assisting, he's involved in the recording activity as well. So, for instance... So, what is the evidence of that, that he was carrying a bag that had lenses or something like that? Yes, he was carrying lenses and batteries as well, and he was also kind of acting as a spotter as well for Grady who was... The officer did not know that. So, you have a causal link. I think another issue you have is just a causal link, if you know what I'm trying to say. Yes. And to that point, though, Deputy Palmer stated that he believed that Adam was an agitator or a protester. So, under the Heffernan case, which is the Supreme Court case from 2016, we look at the subjective beliefs of the government actor to determine whether or not they deprived the First Amendment rights. So, if Deputy Palmer believed that Adam was a protester and agitator, protesting is a clearly established right under the First Amendment, and his actions then would have been taken to chill that action as well. The District Court also didn't pass on the issue of causation. So, there was no determination one way or the other. So, I don't know that you need to do it. I know you can, but it might be better to have the District Court do that as well. Now, but going back to the issue of assisting, I don't think this is any different than if you have a news van that goes out, you know, with somebody driving and a cameraman and then a reporter, and you have a production assistant and they're standing by and, you know, holding the cord that connects the camera to the news van or whatever. Under the District Court's ruling, the cameraman is protected under the First Amendment, but the person holding the wire is not. And so, I don't know that that is a distinction that needs to be made. We can let a jury sort out whether or not he was engaged in recording conduct based on that evidence. Again, understand, reasonable minds can differ, but it should be the jury that decides on that. So, with regard to that, I'm going to reserve the remainder of my time for rebuttal, but we'd ask that the Court recognize that there is a clearly established right under the First Amendment to observe and record. I'd love it for Judge Benton's view to even go further, but in addition to that, we'd ask that you find that there's a question of fact as to whether Adam was engaged in recording activity through his assistance of his partner. Thank you. Thank you, Mr. Futhy. May it please the Court, Mr. Futhy? My name is Jeff Kirkpatrick. I appear today on behalf of Deputy Nicholas Palmer, representing the law firm of Governmental Law, LLC. Let me just go into the argument that Mr. Futhy has raised as far as whether the First Amendment is implicated here. Well, let me go back to what he started with, which is the Fourth Amendment. He said that you have to determine that Deputy Palmer intended to hit him in the shoulder and eye. And I would suggest to the Court that his testimony was that that was not his intention. His intention was to disperse through the use of pepper spray that he was actually aiming for the sidewalk. In this case, he missed, but the previous evidence is that the person that he was aiming at before, he was successful in hitting both the ground first in an attempt to dissuade the attendee. And then, and only then, when the dispersal of the pepper spray did not dissuade him, did he then work his way up the leg and use the impact force of the pepper ball gun in order to get the first gentleman to leave. He attempted to use the same strategy with Mr. Koepp, a little bit further range, and he missed. And that was what resulted in the unfortunate injuries to Mr. Koepp. So when we look at that versus Moore v. Indahar, clearly, Moore v. Indahar was a different situation entirely when the officer used a gun, used deadly force. Of course, the defense in that case was, well, I didn't hit the guy I was aiming for, was the defense in Moore. But it was still a different use of force. And so I would suggest that any court would find when an officer discharges a firearm that is directed toward a suspect or any member of the public, that that use of deadly force puts it in a different category than the use of pepper spray or tear gas or any of the non-lethal uses of force that would be available in order to control what is essentially a riot. Mr. Futhe suggests that my client, Deputy Palmer, was using the pepper ball gun as an impact weapon, and in fact, he was. He talked specifically about the gentleman unidentified before Mr. Koepp, where he first used it as a pepper ball gun to disperse the pepper spray, and then as an impact weapon when the dispersal did not work. But the purpose, both aiming at the ground and aiming at the gentleman's legs, was the same, in order to disperse the craft. That was what all the evidence is, was his purpose in using the pepper ball gun, not only at the two gentlemen along the sidewalk on Cass Street, but throughout the evening. And I would suggest to the court that when you look at what his intent was, what the intent was of all the officers there tonight, that night, was very clear. It was not to arrest as many members of the rioting crowd as possible. It was to protect property and protect lives and to prevent injury by dispersing the crowd as efficiently and effectively as they could. And when we talk about dispersing the crowd, one of the arguments is, well, the riot was essentially over when this incident occurred. And when you look at some of the video that was offered in evidence, you might say, well, it does seem kind of quiet. There were, after all, not 2,000 protesters in the Walgreens parking lot. But what we have to keep in mind is that there were not just the matter of people standing around yelling at the officers and honking their horns, but there was actually violence being directed at the officers. There were rocks and bottles being thrown at the officers standing in the Walgreens parking lot. And in fact, that is what motivated the officers standing on the street corner to call for the pepper ball guns. And when you look at the video where you got the officers standing in the parking lot, you can clearly hear, pepper ball gun, we need a pepper ball gun over here. And why did they need a pepper ball gun over there? Because they wanted to discourage the people that were standing along the street, standing in the trees alongside the parking lot, from throwing rocks and bottles and other objects at the police. What would happen if they didn't do that? Well, this was not a riot that had worn itself out and come to an end. This is a riot that had dissipated and spread to other parts of the city. One of the things when you look at the video and listen to the video and you're thinking, well, there's not a lot going on in the Walgreens parking lot, I would agree with that. But when you listen to the background, you not only hear the honking of horns and the yelling at the police officers in the Walgreens, you also hear the helicopter going overhead, and you hear the regular firing of a pepper ball gun. Well, how is it affected by the fact, assume for a second they end up arresting him, because he has a husband who's yelling at the police officers, and the police do not give him to the husband who's yelling and marching along with him, and they get around him, three or four of them, and march him off to the ambulance. How do you get around the fact that there ended up being an arrest, period? Well, I think as soon as he said, am I under arrest, their answer was no. Yeah, but then that's with three or four around him and then marching away from the husband who's yelling all kinds of things at him. And Deputy Palmer and other officers who were there testified that it was their instruction that if there was anyone that was injured during the course of controlling the protest, that they were, if it was safe to themselves, to offer first aid. And so the situation was that Deputy Palmer fired the shot. He saw the young man, Mr. Kapp, fall, hit the ground. The assumption, correct assumption, was he'd been injured. They were following orders, standard operating procedure, to offer first aid. And so they approached him and- Well, they do more than offer first aid. They helped him get up. There were officers present. We know exactly what was being said at that point. No one said- Go ahead. You had to come with us. There is an argument that could go both ways as far as, you know, how forceful was the physical contact. One of the difficulties there, frankly, is although the clarity from the iPhones is really incredible. I was struck when watching the films with the body cameras in the parking lot versus the iPhone clarity. But it all depends on the angle. And you can't really see exactly what officer held him by the arm or not. And we don't know what force. We do know that, and Adam kept testifying to this, that he was disoriented. Couldn't see very well. Obviously, with one eye, he couldn't see out of it at all. But he was also in shock at that point. And so- Were there three or four officers surrounding him and walking him? Yes. Well, why were there- How many were there? How many officers were there? I was asking. Three or four? I don't remember. I know there were three, three minimum. There were at least three, I think. I think my recollection is that there were four. Me too. Go ahead. And so why would there be four officers to help one young man up? And I would suggest to you that's a matter of officer safety. Because it wasn't a matter of he fell to the ground. He was all by himself. Nobody else was around him. He was down the street a ways. There were a number of people around, both in the trees, along the sidewalk, and also in the vehicles in the parking lot, or standing around in the parking lot. One of the things that the officers were trained to do in crowd control was to provide cover. And so Deputy Strickler, not very helpful in his witnessing of, did you see Adam Kapp, what was going on there? He said, I was limited in what I saw because my job was to provide cover. While Deputy Palmer is doing what he's been asked to do, which is to provide the pepper ball coverage, and to disperse those two people that were closest to the officers on the street corner, it was Deputy Strickler's job to guard him in case there was a threat that emerged. Likewise, as they went to help Adam Kapp, help him up, see if he needed first aid, there were not two officers who went there, but there were four. Because you had to have one or two officers to help him up, and ask if he needed aid. But for safety's sake, for the officer's safety's sake, you had to have a couple of other officers there to provide cover. And when you say, was that really necessary? Well, I think if you listen to the videotape, and you listen to his good friend and what he said, he wasn't saying, I need to help my friend who's maybe injured. He was saying, what's your badge number, bitch? Was he aggressive physically? Not at that time, but he was certainly aggressive verbally. And that comes through on the videotape. And so in order to prevent an escalation, because obviously the friends that came with Adam Kapp could have been angry, because they're... Well, you have a husband there, right? He keeps saying, I'm the husband, right? Husband, or in other... Adam Kapp's testimony was there were a couple of other people that came in the car with him. So there were several friends with him, and they could have been justifiably upset that their friend who was just standing there was injured, for no good reason, would be their perspective. And so I think it was important for four officers to go there to help him, to make sure that the situation didn't escalate. And they helped him back, maybe by taking him by the arm. Was that appropriate? I would argue, yes, that it was. It was a form of restraint. No, that was making sure he didn't trip and fall and injure himself further, because he couldn't see very well in the dark with an injured eye. And so the court below did not have any trouble finding out, finding that there was no intent to restrain him. And in fact, as soon as he was checked out by the paramedic, as soon as he refused to pay for the ambulance to take him to the hospital, they allowed him to go. So when we look at the context of that evening, one of the things that is most striking, and I think that you hit on this, is they had been involved in crowd control for hours at this point. Deputy Strickler, Deputy Palmer were not in the business of targeting people with a pepper ball gun for the purpose of placing them under arrest. They didn't, before this happened with Adam Koepp, they didn't do this with Adam Koepp, and they didn't do it following this incident with Adam Koepp. The purpose of the pepper ball gun was to disperse the crowd. That was what it was used for throughout that evening. And in fact, what it's used for regularly, including in the Dundon case. And I would agree with Mr. Futhi as far as, is it apples to apples? Absolutely not. I mean, you had a big crowd there, a smaller crowd. In the Dundon case, as you're very familiar with the facts, I mean, the crowd was very prepared to protect themselves. And it was at least as volatile a situation. However, I think when you look at the Walgreens scene, it's important not to lose track of the entire context of the evening. You didn't have several dozen people over the course of the evening yelling and throwing things at the officers. You had thousands. You had thousands of people attempting to start fires, throwing chunks of cement, attempting to break into stores. And that was what these officers were dealing with over the course of the evening, and were still dealing with when Adam Koepp appeared out of nowhere, not knowing what was going on. Their job was to try to disperse the crowd as safely as they could. And that was why they used the pepper ball gun. Could they have gone? I guess the question is whether there's a... The fact... First off, they could have been arrested for assaulting officers or failure to disperse, I think, is at least a possible reason. Yes. I know the officer testified that wasn't his intent, but could a reasonable jury take that possibility, plus the fact that the gun actually hit him rather than bouncing off? And would that be enough to create a fact question about, is the officer telling the truth? You would have to have, and I think why the court had no problem, the court below had no problem saying this was not a fact question that should go to a jury, is because it evaded the entire context, but maybe more importantly, because of the nature of the non-lethal weapon. It just is not an effective tool in order to place somebody under arrest. And it wasn't used that way. It wasn't used that way seconds before Adam Koepp was hit. There was another person that was targeted right before that, not for the purpose of taking him under arrest, but for the purpose of dispersal. And for a jury or for the trial court to say, well, you shot this gentleman in the leg because you wanted him to leave, but then you saw Adam Koepp, and for some unknown reason, you wanted to place him under arrest, so you shot him, doesn't, isn't logical. It doesn't track. That's aside from the fact that over the whole course of the evening, when they were engaged in crowd control, they were not targeting someone and then rushing over and placing them under arrest, which they could have under a misdemeanor for failing to disperse. Obviously, they had grounds, but that was not their purpose. And frankly, it's just not a practical way of controlling a crowd of thousands or even hundreds. You don't have the manpower to place a lot of people under arrest. You're trying to get the crowds to disperse before they do more damage or injure someone. But you end up arresting some people in that situation, right? Were there people arrested that night? Yeah. Sure. Probably for breaking into stores. I know there was at least one person that was arrested for possession of a shotgun. Do I know how many people were placed under arrest? I do not. My client and his group from Sarpy County did not place anybody under arrest. It's quite possible, however, that, well, probable, in fact, that Omaha Police Department was involved in arresting a number of people that night. Is there anything further? Hearing nothing, thank you. Thank you. Just real quick to touch upon a few items. As I hear Mr. Kirkpatrick describe it, there definitely was a fact question as to what was happening that night. He set forth the testimony and perspective of Deputy Palmer with regard to attempting to disperse a crowd. That was not Adam's experience. He referenced the first person the Deputy Palmer says he shot. Adam says he never saw that person. Adam had no recollection of hearing any pepper balls strike the ground near him or in the leg. The first hits he had were to the face and to the shoulder. That was the only experience he had. He also heard no dispersal order. Now, I believe there's evidence in the record that the law enforcement officers in the Walgreens parking lot earlier had given a dispersal order. But Deputy Palmer stated he did not give Adam a dispersal order. And Adam said he never heard a dispersal order as well. So again, question of fact as to whether or not this was a dispersion or a apprehension. With regard to the scene as well, I'll ask you to, again, look at the video that tells the tale of what was going on in the Walgreens parking lot. And I get it. Two or three hours before, two blocks away, down on Dodge Street, it was chaotic. I watched it on TV, no doubt. But that's not what was presented at the time that Adam was hit. There is good evidence in the record through the video showing what it was like. Certainly, people were honking their horns. There were people upset. Adam said he never saw anybody throw anything. I've yet to see anything thrown on the video as well. So again, question of fact as to whether there was a chaotic scene when Adam was hit. And again, there was no doubt Adam was not posing a threat. Deputy Palmer said he did not have any apprehension or fear from Adam as well, which suggests that, at least in the area around Adam, there was not a chaotic scene as well. But he got an order, though, right, to shoot toward Adam? So on one of the videos, you hear, we need a pepper ball over here. And that's down at the corner of 42nd and Cass. Adam's about, I think, 175 feet uphill on Cass Street. And so when he comes over there, I'm going to butcher the exact quote, but start shooting the people up there is what he was told to do. And he did. We're running out of time. Is there any other questions? Thank you. Hearing none, thank you. Court appreciates the appearance of both counsels. Case is submitted, and we'll issue an opinion in due course.